THE UNION PACIFIC RAILWAY COMPANY *v.* RYAN, MAR-SHAL OF THE CITY OF CHEYENNE, AND THE CITY OF CHEYENNE.

TAXATION : MUNICIPAL : RAILWAYS.—The system of taxation for muni-cipal purposes, is distinct and independent of that for state and county purposes. The act of the legislative assembly entitled, "An act in relation to the assessment of railways and telegraph lines," ap-proved Dec. 13th, 1879, does not govern the city of Cheyenne in its taxation of property within its corporate limits for municipal pur-poses. The act was intended to affect county organizations, and not particular municipalities, or municipal corporations.

IDEM.—The property of railway and telegraph lines within the limits of the city of Cheyenne, is taxable in the same manner as other property in the city, according to the provisions of the city charter.

PRECINCT.—The words " precinct," " township " and " school district" as used in the act of Dec. 13th, do not refer to, or include municipal corporations.

ASSESSOR.—Where a power is given to a city council to levy and collect taxes, and no officer is provided, in a charter, as a necessary conse-quence the right to levy and collect taxes, would carry with it the power and authority to employ the necessary machinery for that purpose ; the city clerk of the city of Cheyenne, as *ex officio* assessor, had authority to make the annual city assessment.

UNJUST ASSESSMENTS : RELIEF.—Before a party can, or ought to have any standing in a court of equity to receive relief on account of unjust assessments by way of injunction, he should pay what is rightfully due. In this case the railway company failed to pay to the city of Cheyenne the taxes properly due, and therefore the complaint of un-fairness furnished the company no ground for relief.

APPEAL from the District Court of Laramie County.

The facts are stated in the opinion.

*J. A. Riner and C. N. Potter*, for appellant.

The appellant, the City of Cheyenne, claims the right to assess for the purposes of municipal taxation the property of the complainant, situated within its corporate limits, whether it be located upon the company's right of way or

not, in the same manner as other property of the city is assessed, by virtue of the provisions of its charter, which gives it power to "levy and collect taxes for general revenue purposes not exceeding six mills on the dollar in any one year on all real, personal and mixed property within the limits of said city, taxable under the laws of the Territory." Session Laws 1877, page 40–41; Session Laws 1879, page 30.

In enacting the charter of Cheyenne in 1877, and the amendment in 1879, the legislature intended (and their language is clear) to grant to the city the power to regulate their own taxation independent of any other or general law concerning the subject.

In determining the proper meaning and application of the act of December 13th, the two acts, viz: of November 26th and December 13th, must be considered as if they constituted parts of one and the same act. It is a well established principle that statutes in *pari materia* passed at the same session of the legislature, must be construed together, the same as if they were parts of the same act. *Peyton* v. *Mosely*, 3 T. B., Mon., 77; *People* v. *Jackson*, 30 Cal., 427; *Smith* v. *People*, 47 N. Y., 330; 3 Neb., 312; *Commonwealth* v. *Griffin*, 105 Mass., 185; 6 Ind., 354; *Cain* v. *State*, 20 Tex., 355; 14 B. Mon., 166.

Statutes of other states referring to the taxation of railways, and by their terms leaning much stronger than ours toward an application to cities, have come under the scrutiny of the courts, and without exception, they have been interpreted as inapplicable to municipalities. *Dunleith and Dubuque Bridge Co.* v. *The City of Dubuque*, 32 Iowa, 427; *The City of Davenport* v. *The Mississippi and Missouri Railroad Co.*, (Judge Dillon's opinion), 16 Iowa, 363; *Ottawa* v. *County*, 12 Ills., 339; 20 N. Y., 387; *Brown* v. *County Commissioners*, 21 Pa. St., 37; Potter's Dwarris on Statutes, page 155; *McCool* v. *Smith*, 1 Black., 470.

But in this class of cases another principle has been announced, resting upon the principle concerning repeals by

implication, viz.: Statutes of a general nature do not repeal by implication charters and special acts passed for the benefit of particular municipalities. Dillon on Municipal Cor'ps., sec. 54; 20 N. Y., 387; *State* v. *Brainin,* 3 Zabr., (N. J.) 484 and 529; 3 Zabr., 185; *State* v. *Clark,* 1 Dutch (N. J.), 54; *Baldwin* v. *Murphy,* 82 Ill., 485; *Bowen* v. *Lease,* 5 Hill, 221; *Louisville* v. *McKean,* 18 B. Mon., 9; *Railroad Co.* v. *Alexandria,* 17 Gratt, (Va.), 176; *Dunleith and Dubuque Bridge Co.* v. *Dubuque,* 32 Iowa, 427.

With reference to taxation, the word "precinct" has not an understood significance in Wyoming, and this act is the only place in which it is used in that connection. If it means anything, it surely refers to a "taxing precinct." Is Cheyenne a "taxing precinct" in the county as contemplated by this act? This act was adopted from Nebraska, and the word "precinct" is borrowed from that state. It has no ordinary meaning here respecting the subject of taxation. The contrary is true, however, in Nebraska. In that state, in the absence of this railway law, there are regular taxing precincts. The county is divided into assessing precincts, each having an assessor, and all the assessors make their report to the county, and these assessing precincts are independent of cities, and are solely for the purposes of county and state taxation—and for city taxation each municipality has its own assessors. See General Statutes Neb., 1873, sec. 2, page 353, as to precinct assessors; see General Statutes Neb., 1873, sec. 24, page 904, as to reports of precinct assessors; (but this last section does not refer to city assessors.) As to city assessments, see General Statutes Neb., 1873, sec. 29, page 119; sec. 59, page 157.

But this word "precinct" has received a judicial construction by the Nebraska courts. And it is there held that precinct in their statutes means "no more than the word, as ordinarily understood, imports, viz: territorial divisions or districts created for certain political and administrative purposes, but without the semblance of corporate character." *State* v. *Dodge County,* 10 Neb., 20.

It is a principle universally accepted in this country, that as a general rule it is a fair inference that the legislature in adopting a statute of another state which has there been judicially construed, intended to give it the same interpretation it had there received by judicial construction. *Drenman* v. *People*, 10 Mich., 169; *State* v. *Macon County*, 41 Mo., 453; *Draper* v. *Emerson*, 22 Wis., 147.

It is certainly good authority that the ordinary meaning of the term does not comprise an incorporated power; it does not signify any corporate existence, and we submit that words must be construed in their ordinary and usual meaning. Sedgwick Const. of Stat. and Const. L., 224 N.; Potter's Dwarris on Statutes.

If, however, it is held that this act must be construed as applying to municipal corporations, then in thus legislating for such corporations the legislature has exceeded its rights; in other words, if at all applicable to cities, in so far the act is unconstitutional. The organic act of Wyoming says: "Nor shall any unequal discrimination be made in taxing different kinds of property, but all property subject to taxation shall be taxed in proportion to its value." Revised Statutes, sec. 1925.

It may be that the rolling stock of a railway has no situs or location, and thus a tax thereon may properly be proportioned between counties, cities, &c. This may be true to a certain extent with the railway track, but a building of stone or wood certainly possesses a definite situs or location. It belongs where it is erected. Suppose it is owned by the person who owns a railway track and rolling stock, does this fact alter its situs? We think not, and that it is a violation of the organic act not only, but of every principle of taxation and of justice, to proportion it for taxation among jurisdictions in which it is not situated.

Furthermore, it is an unequal discrimination in taxing different kinds of property, all of which are bound to receive equal protection and advantage from the city.

It is urged that the assessor acted without authority. As

to his right to sign as assessor, see *Lessee, &c.* v. *Freman Coates*, 10 Ohio, 278.

But the charter gives the council right to assess, levy and collect taxes in manner as may be provided by ordinance, and they possess all incidental powers, viz: to appoint some person to make the assessment. The clerk, by ordinance, is made *ex officio* assessor. And we submit that the assessor was legally acting as such.

He was in any event a *de facto* officer, and his acts cannot be collaterally attacked. *De facto* tax officers are particularly favored in this regard. Cooley on Taxation, 185, 186 ; *State* v. *Carroll*, 38 Conn., 449–471 ; *Commonwealth* v. *McCombs*, 56 Pa. St., 436 ; *Dean* v. *Gleason*, 16 Wis., 1 ; *Cocke* v. *Halsey, et al.*, 16 Pet., 71 ; *Brown* v. *Lunt*, 37 Me., 423 ; *Smith* v. *Messer*, 17 N. H., 420 ; *Lessee, &c.* v. *Coates*, 10 Ohio, 278.

*W. W. Corlett*, for appellee.

The first question presented in the case involves the proper construction of the act in relation to the assessment of railways and telegraph lines. (Session Laws 1879, pp. 13, 14, 15.)

This act was approved December 13, 1879. The defendants claim the right to make the assessment under section 1, page 80, laws of 1879, being an amendment to the charter of the city of Cheyenne, approved November 26, 1879.

9. "When there are two acts on the same subject, the rule is to give effect to both, if possible. But if the two are repugnant in any of their provisions, the latter act, without any repealing clause, operates to the extent of the repugnancy, as a repeal of the first, and even where two acts are not in express terms repugnant, yet if the latter act covers the whole subject of the first, and embraces new provisions, plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act." *United States* v. *Tynen*, 11 Wallace, 92 ; *Schooner Paulina's cargo*

v. *United States*, 7 Cranch, 52–60; Sedgwick on the Construction of Statutory Law, pp. 194, 195, 199, 200, 201, 205, 219, 100, 102, 104, 105; Dillon on Municipal Corporations, sec. 54; Potter's Dwarris on Statutes, pp. 143–5, 155–6; *Pierpont* v. *Crouch*, 10 Cal., 315. Under our law there is and can be no assessment or assessor of a precinct, except a city; it follows irresistibly, that the legislature meant by the use of the term precinct, a municipal corporation or city, provided of course, the term " city " may be included in the term precinct.   Webster defines the word as follows:

1. The limit or exterior line encompassing a place; boundary; confine; limit of jurisdiction or authority.

2. A district within certain boundaries: a minor territorial or jurisdictional division; especially, a parish or prescribed territory attached to a church and taxed for its support.   Worcester's definition of the word precinct is as follows:

1. A limit; a bound; a boundary; a border; confine.

2. A territorial division; a district.—Bouvier.

The word seems to have no technical legal signification in this country, and hence the legislature, independent of the suggestions already made, must have intended to use it in the sense of a territorial division or district in which the taxing power is exercised.

It is unnecessary to consider the question of express repeal of any provision of the charter of the city, because from what has already been shown there is an irreconcilable repugnancy between the railway assessment law and the amendment to the charter, which, according to the authority of *United States* v. *Tynen, supra*, works a repeal of the charter amendment so far as the assessment of certain railway property is concerned. See *Bank* v. *Bridges*, 1 Vroom (N. J.) 112; *State* v. *Miller*, Ibid 368; 33 N. J., 57–60; Dillon on Municipal Corporations, sec. 54; *Milford* v. *Godfrey*, 1 Pick., 91; *Weston* v. *Hunt*, 2 Mass., 500; *Lakin* v. *Ames*, 10 Cush., 198; *Parish of Brunswick* v. *Dunning*, 7 Mass., 444.

Perhaps the city without express authority might appoint minor officers of a ministerial or executive nature, but it could not appoint an assessor, because in making an assessment he acts judicially, and hence is not such an officer as the city might appoint without express authority given in the charter. Dillon on Municipal Corporations, sec. 146; *Hoboken* v. *Harrison*, 1 Vroom, (N. J.,) 73; *Ter.* v. *Ritter*, 1 Wyo., 318; Cooley on Taxation, pp. 288, 550, 552, 553.

It is conceded that for mere honest error in making an assessment whereby inequalities in the burdens of taxation result, the courts can afford no relief without express authority to do so; but when it appears that the party making an assessment " has been actuated by a fraudulent purpose, and instead of attempting to carry the law into effect, has wholly disregarded its mandate, declined to bring his judgment to bear upon the question submitted to him, and arbitrarily, and with intent and purpose to defeat the equity at which the law aims," it is manifest that a court of equity will afford relief in such a case. Cooley on Taxation, pp. 157–547; *Merrell* v. *Humphrey*, 24 Mich., 170; *Albany, etc., R. R. Co.* v. *Canaan*, 16 Barb., 254; *Buffalo, etc., R. R. Co.* v. *Erie County*, 48 N. Y., 93; *Western R. R. Co.* v. *Nolan*, 48 N. Y., 513; *Fuller* v. *Gould*, 20 Vt., 643; *Stearns* v. *Miller*, 25 Vt., 20; *Wilson* v. *Marsh*, 34 Vt., 352; *State* v. *Central Pacific R. R. Co.*, 7 Nev., 99; *Lefferts* v. *Supervisors of Calumet*, 21 Wis., 688; *Milwaukee Iron Co.* v. *Hubbard*, 29 Wis., 51.

The railway assessment law is valid and establishes the proper basis for the valuation of a railroad and the apportionment of the value among the different taxing districts. *Missouri River, etc., R. R. Co.* v. *Morris*, 7 Kansas, 210; *Missouri River, etc., R. R. Co.* v. *Blake*, 9 Kansas, 489; *Applegate* v. *Ernst*, 3 Bush, (Ky.) 648.

The whole subject of the method of valuing this species of property is committed to legislative discretion, and the courts cannot revise the action of the legislature or override its judgment. Revised Statutes U. S., sec. 1851; Cooley

on Taxation, pp. 274–5 and notes; *The Toledo & Wabash R. R. Co.* v. *The City of Lafayette*, 22 Ind., 262.

Sener, C. J.　This was a suit in chancery instituted by the complainants against the defendants in the court below to restrain them from the collection of certain taxes claimed by the city of Cheyenne for the year 1880.　The complainant asserts several grounds of equitable relief:　First, it claims there was no lawful assessment of that portion of the complainant's property constituting its road-bed, right of way, superstructure, structures thereon, rolling stock, telegraph line, furniture and fixtures and personal property belonging to the appellee, who was the complainant below, the assessment being made by the city assessor, while it is claimed that it should have been made by the territorial assessment board, under the act approved December 13, 1879, of the Territorial Legislature of Wyoming, entitled " An act in relation to the assessment of railways and telegraph lines."　Second, that in any event the so-called city assessor had no authority to make said assessment, no such office as city assessor having been provided for by the charter of said city.　Third, that the assessment of the complainant's property upon which the tax claimed was levied, was grossly unfair, unjust and unequal, and was fraudulently made, with a fraudulent purpose and intent to make the complainant pay an unjust and undue proportion of the taxes collected in said city, all of which was done with a feeling of prejudice and hostility to the complainant. Fourth, that a portion of the taxes so claimed was levied upon a large amount of property not belonging to the complainant, but to another corporation,—the Colorado Central Railroad Company of Wyoming, which property last named was not in the jurisdiction of the city of Cheyenne.

To the bill of complaint filed by complainant, the defendants demurred :

1. To so much of the bill as relates to all the taxes complained of, except those claimed on account of the Colorado

Central Railroad Company, on the ground that the complainant was not entitled to any discovery or relief.

2. To that portion of the bill relating to the assessment of the property of the Colorado Central Railroad Company, and the taxes levied upon the same, on the ground that the complainant was entitled neither to discovery, nor relief by reason of the facts stated.

The district court for the first judicial district, Judge Peck presiding, having heard the case upon said bill of complaint and demurrer, entered a final decree thereon, adjudging the assessments complained of and all proceedings thereon null and void, and perpetually enjoined the defendant from attempting to collect the taxes levied thereon. The appellants appeal from said decree in its entirety, and not from any part of it.

The appellants concede that the decree is proper, and no contest is made as to the part of the bill relating to the taxation of the Colorado Central Railroad Company.

The first question which presents itself for determination by this court is : whether the city of Cheyenne for the purposes of municipal taxation had the right to assess the property of the appellee situated within its corporate limits in the same manner as other property in the city is assessed according to the provisions of the charter which gives it power to levy and collect taxes for general revenue purposes on all real, personal and mixed property within the limits of said city, taxable under the laws of the Territory, according to the terms of its charter as found in the Session Laws 1877, pages 40–41, or whether an act of the general assembly of 1879, passed on the 13th day of December of that year, to take effect on the 1st of January, 1880, in relation to the assessment of railways and telegraph lines, repealed the charter of the city of Cheyenne to that extent, and cast upon the territorial board of equalization, consisting of the governor, territorial treasurer and auditor, the duty of fixing the value of the property of railroad corporations for each mile of road or line, and thereafter required

all assessments of railroad and telegraph property to be made in conformity with the value as ascertained by this board of equalization.

In our opinion the statement in the syllabus of *Mayor &c. of Troy* v. *The Mutual Bank*, 20 New York, 387, that "the system of taxation for municipal purposes is distinct and independent of that for county and state purposes," is not only sound law, but sound common sense. And this line of demarkation runs through all the legislation of the various states as well as of the Territory of Wyoming. An inspection of the 6th chapter of the Laws of Wyoming, passed at its sixth legislative assembly, on page 13 of those laws, shows that the governor, the territorial treasurer and auditor, are made a board of equalization evidently for the purposes of having uniformity in the assessment and taxation of railroad and telegraph lines within the several organized counties, and for county and territorial purposes only, and that that act in no wise worked or intended to work a repeal of the charter of the city of Cheyenne which was granted by the legislature in 1877. That act shows what the board was to do; that act prescribes what the president, secretary, superintendent or other principal accounting officers should do; it speaks of the duty of the assessor of the county or district, evidently meaning the district in the county in which machine or repair shops, or other buildings should be; it prescribes when it shall be done; it specifies that the territorial auditor shall certify to the county clerks of the several counties in which the property of the corporation, or any part thereof may be situated, the assessment so made of the property of such corporation, specifying the number of miles, and amount of each in said counties; and then the county commissioners are directed to divide and adjust the number of miles within each precinct, township or school district, in their respective counties; and then it goes on to give the county commissioners power to levy the requisite tax: all of which shows that the act was intended to affect county organizations,

and not particular municipalities or municipal corporations. The county commissioners have no control over the cities. It may happen, and does happen, that the county commissioners are not citizens of the corporations; it could happen that every one of the county commissioners might be citizens outside of the jurisdictional limits of Cheyenne; and while it would be in the power of the general assembly of Wyoming by an express statute to confer the government of the municipality of Cheyenne upon any body that it saw fit, yet with a granted charter before it, this court cannot presume that county commissioners are clothed with any power or authority over the city of Cheyenne from that act. The only thing that gives color, or can be construed or suggested as giving this authority is the use for the first time in this Territory in a taxing act of the word "precinct;" and this it is seriously claimed may mean an organized municipal corporation.

Now, "precinct," according to Webster, means, "a district within certain boundaries," and in Massachusetts by old laws it had reference to the non-acceptance by the collector of the parish or *precinct*, and authorized the parish to proceed to a new choice. Bouvier says: "In old times it related to the district for which a high or petty constable is appointed in England;" and with this use of the word in modern acceptation it has been argued before the court that it may mean, and is intended to embrace and include, a repeal of the power of the city of Cheyenne to levy and assess taxes, as given to it by its charter, and to cast that burden on a board made up as before stated.

We do not think that such is the meaning, nor do we think any elaborate argument is necessary in stating it. If it be contended that the word township can be so construed as to mean an incorporated city, we answer, first, that no such ground was taken in argument at bar, and secondly, that township has a well defined meaning. *Vide* Abbott's Law Dictionary, viz. "a township is a sub-division of a county for county purposes, more highly organized

than a village, and less so than an incorporated city." The term "township" in cases there cited shows it never means an incorporated city. Of course there can be no pretence that Cheyenne of itself is a school district of Laramie county in any sense. The whole act from the first to the sixth section has reference to the uniformity of assessments and taxation for territorial and county purposes, and has no reference in our view to city purposes.

This brings us to the second proposition, to wit, did the city of Cheyenne assess the property as it had the right to do. Inasmuch as the complainant alleges that the board of equalization for the city acted fraudulently, it is not within our power to *say*, (inasmuch as the demurrer admits all that the complainant states), that the tax has been regularly assessed; but in so far as the question is raised as to the right of the city assessor to make said assessment, no such officer as city assessor having been provided for by the charter of said city, we answer that by the tenth section of the act of the incorporation of the city of Cheyenne, passed December 14th 1877, laws of the 5th legislative assembly, beginning page 37, the city is provided among other officers with a clerk: and by section thirty it is enacted that the duties, powers and privileges of all the officers connected with the city government, not herein defined, shall be defined by ordinance of the city counsel; and by an ordinance of said city as enacted February 4th, 1879, (of which this court takes judicial cognizance the published ordinances in printed form being before it,) *vide* 30th sub-division, 2d section, Act to incorporate city of Cheyenne, approved Dec. 14th, 1877, page 46, the city clerk is made *ex officio* city assessor; and this not only follows the law of the Territory, but follows the decision of the *Mayor, etc. of Hoboken* v. *Harrison, Harp and Walker* in the 30 New Jersey.

It is in the power of the council by ordinance to direct the mode and manner of the assessment and collection of its taxes; hence it results that where a power is given to a council to levy and collect taxes, and no officer is provided in a

charter, as a necessary consequence that the right to levy and collect taxes would carry with it the power and authority to employ the necessary machinery for that purpose. Having ascertained this much, we find the pretended city assessor, as the complainant describes him, had the authority to make the assessment complained of.

The third allegation of the complainants' bill: that the assessment of the complainants' property, upon which the tax claimed was levied, was grossly unfair, unjust and unequal, etc., being admitted by the demurrer we cannot do more here now than to lay down this proposition, which is sanctioned and sustained by all the decisions, that before the complainant can have or ought to have any standing in a court of equity to make such an assertion the complainant should pay what is due.   This is laid down in *Heine* v. *The Levee Commissioners*, 19 Wallace, 655; by the *Alabama Gold Life Insurance Company* v. *Lott, Tax Collector*, 54 Alabama, 499; in 24 Michigan in *Merrill* v. *Humphreys*, 170; in 83 Ill., *The Pacific Hotel Company* v. *Lieb et al.*, 602; 2 Otto, 575, *State Railroad Tax Cases*.   Now the complainant alleges in its bill of complaint that it tendered what was due, to wit, the sum of 363.40.   Even if the territorial board had had the authority to have made the assessment for the city of Cheyenne, of the property of the Union Pacific Railway Co. in and within the city of Cheyenne for city purposes, by the complainants' own bill this was insufficient, and was not the amount due.   Complainant admits in its complaint that it owns within the city two and two-tenths miles; that it owns a branch road of one mile, making three and two-tenths; and it owns the property of the Denver Pacific Railroad, half a mile, which makes three and seven-tenths miles: whereas in its summary in the concluding part of its bill, in which it puts the amount that it is justly assessable with under its theory of the law at $29,600 (besides its real-estate valued at $2,000 by its statement), which is the assessment for three and two-tenths miles, and not for three and seven-tenths miles as it admits in the opening

part of its complaint: so that even upon its own theory of the law, and its own theory of its liability to assessment, it had not paid or offered to pay, when this bill was brought, what was due by the tax on four thousand six hundred and twenty-five dollars ($4,625) at eleven and a half mills, the city rate, would be $53.18; and by the complainants' own showing this amount was then due and payable, and should have been paid as a condition precedent to an injunction; and if the city clerk, acting as city assessor, had the right to assess the complainants' property subject to the authority and control of the council to correct and equalize said assessments, of course a large amount would be due and owing as by complainants' own statements is shown in its allegations as to over-assessments: and this sum should be paid as a condition precedent to the awarding of any injunction to restrain whatever may be illegal and fraudulent as in complainants' bill is charged.

But the complainant alleges that the city council, acting as a board of equalization, unlawfully, wrongfully and fraudulently did pretend to correct and equalize the said assessment, as returned to it by said John K. Jeffrey, so that the same as equalized and corrected by said city council was as follows: 2 miles main track, road-bed, etc., $8.000 per mile, $16,000; 6 miles side track, $5,500 per mile, $33,000; leaving all other items in the said assessment to stand as returned by John K. Jeffrey; and they corrected and equalized the property formerly belonging to the Denver Pacific Railway and Telegraph Company: so the passenger depot was assessed at $600; the rolling stock, proportional value in Cheyenne terminus, $17,000; leaving all other items of the assessment as made by J. K. Jeffrey. Now upon an inspection it will be seen that Jeffrey, as assessor, had put down four miles of main track at $8,000, and four miles of side-track at $4,500. The full assessment of the eight miles by Jeffrey's assessment was $50,000: as equalized and returned by the council it was $49,000. The

complainant claims that the council acted unlawfully, wrongfully and fraudulently, and yet makes no such allegation as to Jeffrey; and if the complainants' allegations are true, and for all the purposes of this consideration, standing upon a demurrer, it must be so considered, it will be seen that the city council absolutely reduced the assessment $1,000 on these eight miles: so that the assessment as unlawful, wrongful and fraudulent as plaintiffs claim it to have been, corrected and equalized by the city council was absolutely reduced $1,000. On the Denver Pacific the wooden passenger depot was put down at $800 by Jeffrey, and reduced to $600 by the city council; whereas the rolling stock, proportional value in Cheyenne was put down by Jeffrey at $10,000, and by the council raised to $17,000, an excess of $7,000: so that putting one against the other it will be seen that the increase by the council over Jeffrey's assessment was the sum of $5,800. Now, as the complainant alleges that this was done unlawfully, wrongfully and fraudulently, and inasmuch as it is conceded that there was no authority to assess the property of the Colorado Central to the Union Pacific Railway Company, and as the demurrer, for all purposes of this case so admits,—yet, as the bill on its face shows that the complainant has not paid the taxes fairly conceded, or shown to be due to entitle it to be heard in a court of equity, and as it may have a case, upon a proper bill for relief in equity,—whilst this bill, in our opinion, will have to be dismissed, and the injunction awarded will have to be annulled and set aside, yet in doing so the court will follow the supreme court of Michigan in *Merrill* v. *Humphrey*, 24th Mich., page 170, while ordering the decree of the court below to be reversed and the injunction to be dissolved, but the bill is to be dismissed without prejudice. The appellants to have their costs in both courts.

Decree reversed.

PECK, J., dissenting.

The bill was brought by the above named company in the district court. It states that the Union Pacific Railroad Company was incorporated under Federal statutes for the construction and operation of a railroad and telegraph line. That afterwards and by 1869 the company located and built its railroad and telegraph line from Omaha westward through this Territory to a point of union with the Central Pacific Railroad, which was being built eastward from California; and that it and the telegraph line were accepted by the Federal government all in accordance with the charter, and that since their completion they have been so operated. That the construction of the road and line was necessary to the public service of the United States: the principal object sought for and obtained by the incorporation and the construction of the road and line, being to secure to the government the transportation of its dispatches and the safe and speedy transportation of its mails, troops, munitions of war and public stores through a country remote, then unsettled and uninhabited, accessible only by great difficulty and expense, and wherein there were no facilities for accomplishing those purposes. That in accordance with the charter and on January 24th, 1880, the Union Pacific Railroad Company was consolidated with two corporations, the Kansas Pacific Railroad Company and the Denver Pacific Railway and Telegraph Company, under the name of the Union Pacific Railway Company, which is the orator; and that by the consolidation the latter became possessed of all the franchises and property of the three companies. That the orator's main line, the road and telegraph line so constructed by the Union Pacific Railroad Company runs through the city of Cheyenne for the distance of two miles and two-tenths of a mile; that it owns without the city a branch railroad track of the length of one mile, a railroad track formerly belonging to the Denver Pacific Railway and Telegraph Company of the length

of one-half mile, and six miles of side-track.   That Cheyenne is a municipal corporation, created under sundry acts of the territorial legislature.

That the clerk of the city returned to the common council for 1880 an assessment against the orator, which was equalized and corrected by the council, and as equalized and corrected assessed the orator for property described as follows; and which tabulated from the bill:

Two miles main track, road bed, &c...........

One-half mile of main track, formerly that of the Denver Pacific Railway and Telegraph Company.............................................

Six miles of side-track...........  ..........

One mile of road to military depot............

Proportional value of rolling stock used on the Colorado Central Railroad....................

Proportional value of rolling stock used in Cheyenne as terminus......................

One hotel................................

Four depots, passenger and freight, and appurtenances...................................

Round house and appurtenances............

Six dwelling houses......................

Frame building..........................

Water and wood depot and appurtenances.....

Express office and furniture...............

Telegraph poles.........................

the assessment specifying a value to each item of said property, the aggregate value being $226,900.   That the assessment so returned, corrected and equalized, included also lands of the orator, which were located within the city, and without its right of way: which said lands and tabulated items were all the property that was embraced in the assessment as the orator's.   That the council has levied taxes on the equalized and corrected assessment; and the city clerk has delivered to said Ryan, the city marshal and *ex officio* tax collector, for their collection, a tax list, certifi-

cate and warrant, issued against the orator.   That said pro-
ceeding of levy and assessment and issuance and delivery of
the tax-list, certificate and warrant were had in pursuance
of an ordinance of the city.   That, excepting the Colorado
Central Railroad rolling stock and the lands, the property so
assessed to the orator consisted of its right-of-way of road
and line, all structures situate thereon (the road bed and
superstructure thereof included), its rolling stock, side track,
telegraph lines, furniture, fixtures and personal property
located within the city; that the Colorado Central Railroad
was, at the time of making the assessment, owned and is now
owned by the Colorado Central Railroad Company, a corpo-
ration distinct from the orator, and its road not extending
within the city limits.   That the total of the taxes levied
against the orator upon the assessment, is $2,888.14, of which
$253.58 are upon its said lands, located within the city and
without its right-of-way, and $86.25 for the Colorado Cen-
tral Railroad rolling stock.   That of the taxes, the orator
has paid the $253.58 and $363.40 of the residue of the total
of the levy, and has been discharged by the city *pro tanto*,
leaving outstanding, and exposed to enforcement, $2,271.16;
and that the collector threatens to enforce forthwith the
collection of this balance.   That the orator owns a large
amount of lands in the city outside of the right-of-way,
which lands are in the market for sale, and the sale of which
are embarrassed by the lien that stands upon the lands
because of the taxes under the territorial laws.   That the
territorial board of equalization assessed and valued the
orator's property, consisting of the right-of-way of its said
roads and telegraph lines, the structures situated on said
right-of-way — side track and superstructures included—
rolling stock, telegraph lines, furniture, fixtures and per-
sonal property, for each mile of said roads and lines; deter-
mined the value of each mile thereof by dividing the sum
of the valuation by the number of miles of road and line;
and thus ascertained the value of each mile to be $9,250:
which assessment and valuation were made for 1880.

Upon those facts the bill complains and specially designates that the orator is exposed to varied injury, which is irreparable at law; and asks for special and general relief here, including relief by injunction.

The defendant demurred to the whole bill for want of equity. Upon that issue the district court passed a decree, which, reciting that the city had assessed that year against the orator certain property, itemizing it as it is itemized in the above tabulation, with the exception that it omitted the "one-half mile of main track formerly belonging to the Denver Pacific Railway and Telegraph Company," and adding the itemized valuations, as they appear in the bill, with the exception that the recital specified a valuation of $2,500 for the "Round house and appurtenances," instead of $25,000, the actual valuation—further reciting that the recited property was the same that was claimed in the bill as only assessable by the territorial board of equalization, that the city had levied taxes upon the assessment, and against the orator, of which a part was unpaid, and had issued a certified tax-list and warrant for the collection of that part—decreed that the assessment, taxes, tax-list, warrants, and all proceedings theretofore had thereon, or on any of them by the city, Ryan or any of their representatives, were void and null; that they were thereby annulled and vacated; and that the city, Ryan and each of their representatives were perpetually enjoined from all attempt to execute the warrant, enforce the collection of any of the taxes, or use the assessment. It is clear that the decree was intended to be a sweeping decree against all the assessment but the part relating to the lands, and against all the outstanding taxes; the item of one-half mile of main track of the Denver Pacific Railway and Telegraph Company having been omitted, and the value of the round house and its appurtenances misstated in the recital by inadvertence.

What the symbol, " &c.," means in the assessment item, described as " two miles main track, road bed, &c.," it is

impossible to understand; the use of the symbol in assessment description is vicious and unlawful; the tax-yayer cannot be assessed by expressions which conceal the property assessed, and serve equally to cover something and to cover nothing; and whether the objection might or might not have been reached here, had the assessment specified separate values for the " &c.," and the residue of the item—yet, as but one value was extended in gross against the item, should it result that the residue was beyond the assessing jurisdiction of the city, the objection for defect of jurisdiction will necessarily cover the whole item. Again, though no right-of-way *eo nomine* appears in the assessment, the latter is consistent with the allegation of the bill, that all the property assessed to the orator, except the lands and the Colorado Central Railroad rolling stock, consisted of its right-of-way and the structures situated thereon— side track, road bed and superstructures included—its rolling stock, telegraph lines, furniture, fixtures and personal property, located in the city. The assessment of the lands is conceded to be correct; the validity of the rest of the assessment is denied. The defendants justify the part so denied, under section 1, at page 30, of the Laws of 1879, of the statute of November 26th of that year, amending the city charter of December 14th, 1877; which section declares that it shall have power to assess, levy and collect taxes for general revenue purposes, on all real, personal and mixed property within its limits, taxable under the laws of the Territory; that, to compel payment of taxes, it may distrain and sell personal property; that all city taxes shall be liens upon the lands of the tax-payer; that the city may sell for taxes lands so under lien, and convey them to purchasers; and may attach a penalty to delinquent taxes; and may, by ordinance, provide for the exercise of these powers. The orator claims that the property which is embraced in that part of the assessment whose validity is controverted, can be assessed only under the statute of December 13th, 1879, entitled, "An act in relation to the

assessment of railways and telegraph lines," at page 13, of the Laws of 1879. The two statutes relate to the same subject matter: and the question—under which of them was the disputed property assessable?—turns upon the inquiry, whether the act of November was repealed by that of December, as to the description of property that is covered by the latter; if not repealed, the city had—if repealed, it had not jurisdiction to make the assessment; and in the latter case the assessment is void.

I will first consider the question by treating the earlier act as special, and the latter one as general. Section five of the latter declares that "All acts and parts of acts, providing for the assessment of the property of railroad and telegraph companies, and the equalization of assessments inconsistent with the provisions of this act, are hereby repealed, so far as they provide for the assessment and equalization of the property of said railroad and telegraph companies." As the section makes inconsistency the test of repeal, it brings us directly to the rule of repugnance. The appellants claim that a prior special act passed for the benefit of a municipality cannot be repealed by a subsequent general one; but the proposition is wholly untenable. Implied repeal is not favored, because of the presumption that had the legislature intended its repeal, it would have said so in direct terms, and because of the difficulties and hazards which attend the application of the rule of implied repeal. The disfavor increases between a special and a later general statute, because of the other presumption that as between special and general terms on the same subject, the special was intended to control. But whether the prior law be general or special, an implied will dispense with the necessity of an express repeal, provided implication applies in the given case, and is complete in itself. The two laws being upon the same subject matter, the whole inquiry is one of intent. If the later law intends to terminate the earlier, the effect must necessarily follow; for the legislative will being supreme within its sphere, its latest expres-

sion on the same subject must prevail; and it is a mere difference of form, and therefore immaterial, whether that will be expressed directly or indirectly.  But to·rise to the force or equivalence of direct expression, the implication must be necessary—unavoidable; it can be such only when the two acts are repugnant—irreconcilable.  If after thorough comparison they remain in this antagonism, the intention is manifest, and as the later must operate, the earlier must yield.  Repugnancy being the criterion, it must rule the prior statute as much, if special, as if general.

The following are tests: is the new intended to·be a revision of the old? if it is, it is a substitute for the old; or, the two being upon the same subject, does it introduce a new, and what·is clearly intended to be the sole rule upon the subject?  If it does, it displaces the old; do the statutes confer the same power upon two different public bodies, and one which cannot consistently, with the clear object of the legislature, be exercised by both?  If so, the later must prevail; can the later be satisfied without infringing upon the former?  if not it overrules it.  The following cases show that what I call tests, are adjudicated propositions; the 13 How., 412, *Norris* v. *Crochet*, and 11 Wall., 88, *United States* v. *Tyner* held that, if the new statute covers the entire subject matter of the old with changes, it is a substitute for it; the 11 Wall., 652, Henderson's Tobacco that, if the new contains new provisions on that subject matter, plainly showing an intention to operate as its substitute, it repeals it; the 33 Pa., 81, and 511, Wheaton's Estate ; 15 Cal., 294, *Sacramento* v. *Boid*; 40 Miss., 268, *Swann* v. *Burke*; 15 Gray 54, *Weeks* v. *Walcott*, that the later repeals the former act if it introduces a new rule on the same subject matter, which it intends shall be the only rule upon it; the 12 Allen, 480, *Commonwealth* v. *Killiher*, that the new repeals the old, if it revises it with slight variations; and the 12 C. B. N. S., 161, *Daw* v. *Metropolitan Board*, that, where the same power is given by different statutes to different public bodies, and cannot be exercised by both consistently with

the legislative object, the later statute will prevail.   These
tests are different statements—varied illustrations of a rule,
which turns upon one central element—a repugnancy which,
wherever it exists, inevitably works repeal.   This has been
and is the uniform rule in the supreme court of the United
States announced in the cases already cited and in others,
and therefore governs here, whatever the law on the subject
may be elsewhere.   But from the nature of the subject it
must be the universal rule.   Remarks are made by judges
and authors occasionally, which, considered in the abstract,
countenance the appellant's proposition, but which consid-
ered in their connections, oppose it.   The sum of the mat-
ter is, that whatever embarrassments attend the rule relate
not to its existence, but to its application.

Again, treating the rule of implied repeal as existing at the
common law, I regard the repealing section in the act of De-
cember 13th as declaratory; but, if the rule did not exist, so
that without this repealing provision a repugnance between
the two acts would not work repeal, the provision would
constitute a rule, and, there being repugnancy, work repeal.

Does this act repeal the first section of the act of Novem-
ber, in respect to the property which the former commits to
the territorial board of equalization for assessment?   Are
they in conflict in respect to jurisdiction over this property?
The former act directs that every railroad and telegraph
company, having property in more than one county of the
Territory where the company is assessed, is to furnish the
auditor by July first, annually, for assessment and taxation,
a list of the following property belonging to the company
in this Territory — the right-of-way, all structures situated
therein (side track, road-bed and its superstructures and
telegraph lines included) rolling stock, furniture, fixtures
and personal property; the list to specify the number of
miles of road or line within the Territory, and the number
in each organized county in the Territory; that such return
not having been made, the auditor shall procure the pre-
scribed information; that the list having been furnished,

or information procured, the territorial board of equaliza-
tion shall assess and value the property, so returned to it,
for each mile of the road or line, and for that purpose shall
consider the list furnished by the company, or the informa-
tion procured by the auditor, and such other reliable inform-
ation as it can obtain upon the subject; and shall ascertain
the value per mile by dividing the total of valuation by the
total of the miles of the road or line. The unmistakable
intent of the provision is, that in ascertaining the total and
the mile valuation, the board shall treat the right of way,
all erections and improvements within it, the rolling stock,
furniture, fixtures and personal property as the component
parts of that whole; and the miles as of equal relative value.
This method of valuing a railroad or telegraph line for tax-
ation, considers the road or line as a unit or an entirety;
each part as inseparable from all the other parts; as depen-
dent for its own value upon all the other parts; and as con-
tributing equally with every other equal part, to the value
of the rest; and the component items of right-of-way,
erections and improvements therein, rolling stock, furniture,
fixtures and personal property as the component items of
the equal parts of the road or line in equal degree. The
method then is to value the whole by equalizing the values
of the parts; and proceeds upon the only correct principle.
From its very nature the principle calls for uniformity of
application. It applies with equal reason to one part of the
Territory as to another,—to a taxing district within a county
as to a county; so far as the application is not uniform the
principle is an idle abstraction, and the exception senseless
and unjust. The adoption of the principle thoroughly indi-
cates an intention to inaugurate it into an uniform rule;
and unless some other provision limits the action of the prin-
ciple, it must be because there is nothing to prevent its
being the uniform rule.

The charter declares that the city may assess as it shall
provide by ordinance: that is, that the city may assess at
will; for the purpose of assessment, it empowers the city

to treat a portion of the road or line as a unit — an entirety; and an inseparable part as a separated whole. The city exercised this power by the ordinance under which its present assessment was made. Regarding each assessment as correctly, and therefore as fairly made under its principle, no more striking illustration of the mischief and wrong of ununiformity, and the justice and necessity of uniformity can be desired, than is presented by the discrepancy between the assessments,—the city valuing at $226,900, property which the board values at less than $34,225, the difference resulting from a disregard of the principle of equalization,—and the appropriation to the city as a basis of taxation more than $192,675 of value, which belongs to the rest of the road and line, outside of the city, by the rule of diffusion—the rule of the unit, the entirety ; and no more belongs to the city, than it would, if this difference of value represented, locally returned beyond the city limits. The discrepancy is rendered more striking by the fact that the city assessment embraces no personal property, furniture or fixtures—unless the item of appurtenances, specified in the assessment in connection with passenger, freight, water and wood depots, cover them, and except also the furniture of an express office ; while the board assessment embraces personal property, furniture and fixtures generally. As the orator's road and line run within the same right-of-way, the mile valuation must be taken to cover the two in the board valuation.

The history of the legislation in the Territory upon the subjects pertains to the understanding of the act of December 13th, in respect to the extent of its application. The theory of all the statutes approved before December 13th, 1879, and beginning on December 10th, 1869, for raising territorial and county revenue by taxation of a railroad company, whose road ran into more than one county, was, that all its property, actually located in a county, should be assessed to that county, as a unit or an entirety of value, separate from the company's property located in the rest of

the Territory; except only the rolling stock, which was to be porportioned to each county in the proportion of the number of miles in the county to the length of the road. The orator's main road only has passed into more than one county of the Territory, its telegraph line being practically a part of it; while the theory of territorial and county revenue system was not confined to this road, it embraced the road, and the latter must have been in special view of the legislature in the adoption of the theory. The school acts, beginning with December 10th, 1869, provided for school district taxation, based on the county assessor's return, without prescribing the principle or method of assessment to be observed by him; up to December 10th, 1873, he could, and afterwards was obliged to return the school district and county assessments together, and would naturally make the former, as he did the latter; the most expensive, and therefore the most onerous school districts have embraced the most populous sections, and thus the course of this road. The general act of December 16, 1871, for the incorporation of towns and cities, in providing for their municipal taxes, required the county assessor in making up the county rolls, to note against the name of each taxpayer all the property owned by him, within the municipal limits: so that the municipal followed the rule of the county assessment in respect to railroad property. The first charter of the city of Laramie, passed December 13th, 1873, empowered the board of trustees to make such ordinances, consistent with the organic act and the other laws of the Territory, as should be necessary to the government of the city, rendering the board in the first instance the judge of what would be necessary; and the charter also required the city assessor to assess all property liable to taxation in the city, (and that included railroad and telegraph property), under such regulations as the board should prescribe; and to return his assessment to the board, by whom it should be revised; the second charter, passed December 29th, 1875, conferred upon the board the same power to make

ordinances; required the city assessor to assess at the true cash value, and return his assessment to the board, which was to be a board of revision, with the amendments of 1877 and 1879 to this charter, leave it unaffected in these particulars of power. The two, being all the charters of Cheyenne passed severally on December 10th, 1869, and December 14th, 1877, confer upon its board of trustees like powers to make ordinances, and provide that the assessment shall be made in such manner as the board shall prescribe; and the amendments to the charters left them unaffected in these particulars of power. Their respective charters authorized those two cities to assess in their judgment, and directly invited them to assess upon the principle not of unity, but of separation. Prior to December 13th, 1879, the only board of territorial division was the Territorial Board of Equalization, but its jurisdiction was limited to revising the county assessments of real estate, to equalizing by adding to the aggregate valuation of a county, so far as it was undervalued, and deducting from that aggregate so far as it was overvalued; and it is at least seriously questionable, whether this power was not confined to making a real estate basis of valuation for the Territory. But this jurisdiction of the territorial board was not intended to serve, nor did it serve the purpose of assessing a railroad or telegraph line which extended into more than one county, as a unit of value, because it took in property which was without, and excluded property which was within the writ. Thus the statutes stood until December 13th, 1879: the several taxing districts bound to no common rule of assessing this road and line— some required and the rest permitted to assess against this principle of unity—upon the principle of separation. It necessarily followed that some districts were deprived of values that were due to them; and that others appropriated values that were in excess of their dues; and, that where no bad faith was intended against the company, valuations would often, for want of a common standard, be inflated. A more complete system of unequal taxation could hardly

be devised, than is presented by this mass of ununiform, incongruent legislation. This condition of the statutes constituted an imperative need of corrective legislation, and put upon the legislature the duty to supply it by a unifying system. I am compelled to say that the act of December 13th, 1879, so far as it has been analyzed in this opinion, meets this want and satisfies this duty. Let us next see how its further provisions bear upon the idea that it intended to correct the evils by becoming the future rule of all the taxing districts.

The statute next provides that, after the territorial board of equalization shall have so assessed and valued the road and line, the territorial auditor shall certify to the clerk of each county in which property of the company is situated, the mile assessment, so made, the number of miles in each county, and the aggregate of the assessment due to the county; and that "the county commissioners shall therefore divide and adjust the number of miles and the amounts falling within *each precinct, township and school district* within their respective counties; and cause such amount to be entered and placed on the lists of taxable property, returned by the several assessors;" as the county proportion of the assessment is usually certified to by the county clerk, a subsequent provision of the act requires the county commissioners, in levying the county taxes, to treat it as a part of the general county assessment; as the apportionments to the precincts, townships and school districts go directly upon their assessment lists, it follows that the taxes thereafter laid on those lists embrace these apportionments. What then does "precinct" here mean? Presumably it was inserted in the text, to assist in the expression of its intent; unless it can be shown to be meaningless, or that it must be cast out, in order to give effect to the text, the court is no more at liberty to ignore it, than it is to strike it out, to alter, to reconstruct the statute; it is conceded that it has a function in presenting the sense of the act, that effect must be given to it, so as to give effect to the

act; indeed apportionment must be made to the precinct by the command of the statute: it is also conceded that "precinct" means, as it stands in the text, *taxing* precincts —the same as if the text so read. "Precinct" in its textual connection, is relative to county: signifies *a minor territorial or jurisdictional division*: is a generic term, to which "township," "school district," are specific, and in which they are included, and a taxing territorial jurisdiction or division is a taxing district. Hence the textual rendition is that the commissioners shall apportion to every township, school district, or other minor taxing district, the number of miles and valuation aggregate, that fall within it, and cause the same to be entered upon its assessment roll. If more clearness is needed to this interpretation of "precinct" as a functional term in the text, it is furnished by the prefix, "each:" the reading is, "each precinct." Cities are thus included, as taxing districts, as clearly and completely as if they were specified *eo nomine*.

What does the word "township" here mean? Unquestionably it signifies in its connection, not an unincorporated division of a county, but an existing municipality; one of its senses is the corporation of a town, and this is the sense in which the statute employs it—the same as if the reading was "town" instead of "township." "Town" means or includes "city" in a statute, if the sense so requires. In many of the states of the Union the terms, "town," "city," as law terms, are synonymous. In England, "city" means "an incorporated town." In the generic sense of incorporations the terms are equivalent, but there is a technically specific sense, in which they differ, "town" being a municipality whose municipal laws and regulations are established by the popular vote of the town, and entrusted for execution to officers elected by that vote; and "city" a municipality, where the making and execution of the municipal laws and regulations are committed by the popular vote of the city to its officers elected by that vote. Now between these generic and specific senses, the statute should be read in the

former as the broader sense, because it is a corrective statute; therefore a liberal construction, the better to effectuate the intended remedy; the statute is corrective because it was passed not to declare, but to change the law; this assumes that the change was intended to supply a want; the want was a mischief.

Again, the charter of Cheyenne made it a city in the specific sense; the amendments leave the characteristic; and "town" is not used in the charter or amendments; the charter of Laramie made it a city; the amendments,—they are only to the second one—leave the characteristic; but throughout the charter and amendments, "town" and "city" are constantly used and as equivalents; these charters were modeled on those of Cheyenne: the act December 11th, 1873, incorporating Evanston, made it a city in the specific sense; was modeled after the first charter of Cheyenne; but it designates it as a town—that term, not "city," only being used in the act; the act of December 16th, 1871, "For the Regulation of Towns and Cities," which is a general incorporating act, uses the terms synonymously. I have searched exhaustively the territorial statutes, and have found no instance in which they are not used in the same sense.

I conclude that the act of December 13th was intended to be a revision of, and a substitute for the prior acts upon its subject matter; that it introduced a new, and what it clearly intended should be the sole rule upon that subject matter; that it and those prior statutes confer the same power upon different public functionaries, one which can not, consistently with the clear purpose of the legislature, be exercised both by the new and the old; that the act of December 13th cannot be satisfied without infringing on that of November 26th and the other previous acts; that the act of December 13th is repugnant to, and irreconcilable with that of November 26th, and those other acts; and repeals them to the extent of the repugnancy; and that the effect of the repeal, as to the act of November 26th, was to

transfer the jurisdiction, which the city of Cheyenne had anterior to January 1st, 1880—the date at which the repealing act took effect—for the assessment of the property that is covered by the latter act to, and exclusively vest it in the territorial board of equalization: and consequently that the assessment which was made by the city of the orator's property, above tabulated in this opinion, excepting the Colorado Central Railroad stock, and all the proceedings based upon the assessment, are without jurisdiction and void.

As to the last mentioned stock: the assessment of that is void for the same reasons, irrespective of, and without passing upon the effect here of either of the facts, that it did not belong to the orator, and that the road did not extend within the city limits.

In the conclusion that the statutes of November 26th and December 13th are repugnant, I have treated the latter as general legislation, thus subjecting it to the most rigid test of its meaning, and considering it most favorably for the appellants; but the latter act is special in each of its particulars, the property covered by it, the method of listing, the principle and method of assessing, the method of apportioning the assessments, and the board empowered to assess; both acts being special the repeal more clearly follows.

I think however, that the act of November, though special as a municipal grant, is general in its grant of power; while that of December is special in its grant of power; hence the presumption that general yield to special words, shifts from the later to the earlier statute; and we find as the real starting point in the comparison, that this presumption is against the earlier, and in favor of the later statute; thus the repeal still more clearly follows. The case of the *State* v. *Jersey City*, 25 New Jersey Law Rep., 170, bears directly on this proposition; the general powers as they were construed to be, conferred upon the city by its charter, being held to be controlled by the special ones, as they were construed to be, which were conferred upon the railroad by its charter.

The disputed assessment being jurisdictionally void, it was the duty of the district court to vacate it, the taxes which were based upon it, and the liens which were apparrently created by the taxes; and to stay the collection of the latter. The decree rendered below, should therefore be affirmed, but with a modification embracing the one-half mile of the main track of the Denver Pacific Railroad and Telegraph Company, and rectifying the misstatement of the value of the Round house and its appurtenances.

The foregoing conditions render it unnecessary to consider a further ground of relief, which is claimed in the bill, namely, that a portion of the property, the jurisdiction to assess which is claimed, was fraudulently assessed.

The majority of the court decide that if the bill presents ground for relief because of either the want of jurisdiction or the presence of fraud, it concedes an equity to be due from the orator to the defendant in respect to a part of the taxes, which the city levied upon that property. The territorial board assessment per mile was $9,250; the total of miles within the city, $3\frac{7}{10}$; total assessment for it $34,225; aggregate of the rates, laid by the city on the assessment which it made .011½; the orator paid upon the amount so resulting, $363.40, which last sum it alleges was the sum of taxes justly and equitably due from it to the city upon a just and lawful assessment of that property. Upon these data that majority hold that the orator should have paid toward those supposed taxes, and on the basis of the territorial board assessment, and according to its own theory $53.18 more; therefore in all $416.58; the $53.18 thus constituting the unsatisfied equity. But upon those data the orator should have paid, if under any equity in the premises, only $393.52, and its payment was deficient only to the amount of $30.19. The difference in the sum of deficiency does not affect the principle. If there was an equity, there was a deficiency, and the orator is not entitled to relief. But there was no equity. One of the self-evident principles of taxation is, that a basis for taxing,—a completed assess-

ment—must exist before a tax can be levied; because a tax is relative, is intended to raise a given amount of revenue, must be laid to produce, as nearly as may be, a given amount of revenue, without excess or deficiency, and the rate must be selected accordingly: hence, the basis must be ascertained before the rate can be determined,—must precede the rate. The proposition of the existence of the alleged equity, assumes that the city had not, and that the territorial board had the jurisdiction to ascertain the assessment; that the act of December 13th was the only rule upon the subject. Therefore that rule must be observed before an assessment can result. To produce the result, the portion of the territorial board assessment due to the county, must be certified down to it from the board; and out of that proportion the part due to the city must be placed upon its list by the county commissioners in order that it may authoritatively get there: until that has been done the city cannot have, and when that has been done, the city has a completed assessment against the company of the property in question. There is no indication in the bill, that the city had received its proportion from the county, or that the latter had received its from the board out of the assessment for 1880, —none, unless it is to be found in the allegation of the orator's claim, that the $363.40 paid upon the taxes, fictitiously raised by the city on its assessment, were the amount of taxes justly and equitably due from it to the city upon a just and lawful assessment of the property; but that allegation cannot consistently be held to admit a fact to which it is directly antagonistic. This is the sense of the matter as the case stands before us.

When the bill was brought the city had no authoritative assessment against the orator of this property; and neither had attempted to levy, nor could have levied any tax upon such assessment; that majority has found the existence of a debarring equity against the orator, where one cannot be found,—that is, in an assessment which is inchoate and therefore unfit to receive a levy; and in a rate of taxes that the

city adopted for, and that was adequate only to its assessment—but which this court applies to an assessment such as if it existed, would be inadequate to the rate—yielding less than the requisite revenue, a rate which, with its assessment, the propositions of this existing equity assumes to be void; so that to find the equity the court makes a rate for the city which the latter alone is competent to make for itself; and so, as the court is not a taxing power, its action herein is assumptive and arbitrary. The orator declares that it paid the $363.40 upon taxes laid by the city on its assessment, therefore not upon any laid upon the territorial board assessment,—the defendants admit that such was the fact, and the court is bound by it, as the fact the payment then was made upon taxes that had no legal existence, was superfluous, and would have been if it had been a payment of the $393.59,—was evidently done in an excess of caution, and the supposed equity does not exist. There would seem to be no room for error on the subject.